United States District Court
Southern District of Texas
**ENTERED**
March 31, 2023
Nathan Ochsner, Clerk

**Exhibit 2**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KIM L. THOMAS, Plaintiff, | § | CIVIL ACTION NO 4:21-cv-01301 |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| UNITED AIRLINES INC, Defendant. | § | |

**OPINION AND ORDER
GRANTING SUMMARY JUDGMENT**

The motion by Defendant United Airlines for summary judgment is granted. Dkt 36. Its prior motion to dismiss is denied as moot. Dkt 25.

1. Background

Plaintiff Kim Thomas is a former employee of Defendant United Airlines. Thomas is Black and suffers from ulcerative colitis. She claims in this action that United discriminated against her on account of both her race and her disability.

Thomas worked at United from 1992 until her termination in 2019. She claims to have made numerous complaints of racism and harassment during her employment with United. These were directed at her manager, Heather Holmes, and her HR representative, Amanda Lye. See Dkts 36-2 at 8 (Thomas deposition), 38-3 (email complaint) & 38-11 at 2 (Thomas affidavit). Like Thomas, Holmes is Black. The record isn't clear as to Lye.

Ulcerative colitis is a chronic disease of the large intestine with symptoms ranging from stool urgency to persistent diarrhea. Dkt 38-11 at 2. Thomas received

intermittent leave under the Family and Medical Leave Act as early as 2017. Her FMLA status permitted her to take job-protected leave once a week (for up to two days) for her condition. Dkt 36-1 at 6–9 (FMLA approval).

As an employee of United, Thomas had pass-travel privileges permitting her to travel standby on United flights. In most cases United prohibits employees from using pass-travel privileges while on sick leave. The airline also reserves the right to "investigate any travel conducted while on sick leave." Id at 47 (pass-travel guidelines). Thomas was ultimately terminated after investigation into her attempted use of such privileges on July 20, 2019.

a. July 20th incident

Thomas was scheduled to work an eight-and-a-half-hour shift on July 20th. Instead, she planned to travel to Detroit that day. Thomas traded over six hours of her shift with a colleague to free her schedule. Id at 16. She conferred with another colleague about trading the remaining two hours but never completed the trade. Id at 43. This meant that Thomas was expected to work two midday hours that day. Even so, she booked a standby reservation for a flight from Houston to Detroit on the morning of the 20th, which rolled over to additional flights that morning and early afternoon. Dkt 36-2 at 34–35.

Thomas claims to have decided not to travel after having taken ill with diarrhea and vomiting while waiting for her flight. She further claims to have driven herself to the emergency room at HCA Houston Healthcare Northwest, in part because her heart was also racing. Id at 36–37. She says that she was only briefly there and given something to stop her vomiting. Id at 37.

Following this alleged hospital visit, Thomas called United's sick line to apply her FMLA intermittent leave to the two hours of her shift that she missed earlier that day. But United discovered that Thomas had arranged to use her pass-travel privileges that same day. It thus opened an investigation into a potential violation. Dkt 36-1 at 49.

b. August 6th meeting

On August 6, 2019, Holmes (as Thomas's manager) conducted the first of two important in-person meetings with Thomas as part of United's investigation. Both Thomas and Holmes were present in person, and an HR representative named Laurie Ledonne was present by phone. Thomas says that Ledonne warned Thomas (apparently after asking to retrieve her phone) that she wasn't allowed to leave the meeting room. She also says that she asked Holmes during the meeting if she could use the restroom, which Holmes refused. Fearing that she'd be fired if she left without permission, Thomas claims to have soiled herself during the meeting. Dkt 36-2 at 15, 18.

Thomas was also asked to submit a written statement as part of this meeting. She complied, submitting a handwritten statement and an email addendum. Dkt 36-1 at 22–23. United found inconsistencies between these statements and the company's records. It then placed Thomas on paid administrative suspension on August 7th pending further investigation.

Thomas claims to have informed Holmes on August 7th that she soiled herself during the meeting the day prior. She says that Holmes reacted with vulgarity and hostility and forcefully ordered her to leave. Dkt 38-11 at 3.

c. August 16th meeting

The second meeting took place on August 16, 2019. Holmes scheduled this meeting on August 13th and asked that Thomas bring with her the papers from her July 20th emergency-room visit. Dkt 36-1 at 24. As it turns out, Thomas then visited the hospital that same day for her ulcerative colitis, staying overnight until the 14th. Dkt 36-5 at 6.

When Thomas arrived to the meeting on August 16th, she hadn't brought the requested papers but had instead prepared another written statement. She was reportedly looking weak and claims to have asked Holmes to reschedule. She presented her hospital bracelet and a doctor's note that stated she shouldn't return to work until

August 22nd. Dkt 36-2 at 14–15; see also Dkt 38-9. Holmes allegedly insisted that Thomas attend the meeting that day, saying that her failure to do so would be taken as a failure to cooperate in the investigation. Dkt 36-2 at 14–15.

d. Subsequent termination

Thomas faxed her emergency-room discharge papers to United's medical department on August 20th. See Dkt 36-1 at 31–32. The medical department attempted to authenticate the papers. In doing so, personnel for the department contacted employees at HCA Northwest, all of whom said that Thomas wasn't seen at the hospital on July 20th. Id at 56–57; see also Dkts 36-3 & 36-4.

Holmes conducted a third meeting on September 7th with Thomas to give her an opportunity to explain the purported visit to the emergency room on July 20th. Thomas maintained that she had visited the hospital that day but provided no further information to verify that claim. See Dkt 36-1 at 34–35.

United concluded from its investigation that Thomas (i) falsely claimed that she went to the HCA emergency room on July 20th, (ii) submitted a falsified document to support her purported visit, and (iii) refused to cooperate with the investigation. It also concluded that this conduct merited termination and initiated the termination process. Thomas was officially terminated on October 31, 2019. The final decision was rendered by Michael Mayo, who is Black. Id at 49–51.

Thomas appealed this termination through the grievance process. At a hearing on her appeal, Thomas claimed that HCA employees had said that she never visited the hospital on July 20th because she had a confidentiality agreement with the hospital. Her grievance was denied. Id at 58–59.

Following this hearing, HCA produced medical records in response to a subpoena from United. The records indicated that Thomas visited the hospital on several dates in 2019, including overnight on August 13th and 14th—but not July 20th. See Dkt 36-5 at 6. The records also showed

that HCA generates account numbers that are unique to each patient visit. The discharge papers that Thomas submitted for the purported July 20th visit bore an account number of BN0243033660. Dkt 36-1 at 32. That, in point of fact, is the same number from the records of the overnight hospital visit on August 13th and 14th. And that visit occurred just a few days before Thomas faxed the purported discharge papers to United's medical department on August 20th. See Dkt 36-6.

e. Procedural history

Thomas filed a charge with the EEOC in February 2020 and was issued a notice of right to sue in early 2021. She then filed this lawsuit against United.

She asserts claims under both federal and state law for race discrimination, disability discrimination, failure to accommodate, and various forms of retaliation. The federal claims proceed under Title VII and the Americans With Disabilities Act, while the state claims proceed under the Texas Commission on Human Rights Act. Dkt 21.

United has moved for dismissal of the failure-to-accommodate and retaliation claims. Dkt 25. It also more recently has moved for summary judgment on all claims. Dkt 36. The motion for summary judgment being sufficient to address all claims by Thomas on the legal merits, the motion to dismiss needn't be independently considered.

2. Legal standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics Inc v Oregon Cardio-Devices Inc*, 257 F3d 449, 456 (5th Cir 2001), quoting *Anderson v Liberty Lobby Inc*, 477 US 242, 248 (1986). And a dispute is *genuine* if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v CCC & R Tres*

*Arboles LLC*, 736 F3d 396, 400 (5th Cir 2013), quoting *Anderson*, 477 US at 248.

The summary judgment stage doesn't involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v Harris County*, 956 F3d 311, 316 (5th Cir 2020). Disputed factual issues must be resolved in favor of the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008).

The moving party typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice Designs LLC v Haydel Enterprises Inc*, 783 F3d 527, 536 (5th Cir 2015); see also *Celotex Corp v Catrett*, 477 US 317, 322–23 (1986). But when a motion for summary judgment by a defendant presents a question on which the plaintiff bears the burden of proof at trial, the burden shifts to the plaintiff to proffer summary judgment proof establishing an issue of material fact warranting trial. *Nola Spice*, 783 F3d at 536. To meet this burden of proof, the evidence must be both "competent and admissible at trial." *Bellard v Gautreaux*, 675 F3d 454, 460 (5th Cir 2012).

3. Analysis

a. Race discrimination

Thomas brings claims for race discrimination under Title VII and the THCRA. See 42 USC § 2000e-2(a)(1); Texas Labor Code § 21.051. She doesn't contend that she has direct evidence of discrimination. Her claims must therefore be analyzed under the modified burden-shifting framework set out in *McDonnell Douglas Corp v Green*, 411 US 792, 802 (1973).

Under that framework, a plaintiff must first set forth a *prima facie* case of discrimination. If the plaintiff does so, discrimination is presumed, with the burden shifting to the

employer to articulate a legitimate, non-discriminatory reason for the underlying employment action. If the employer offers such a reason, the discriminatory inference disappears, and the plaintiff must present evidence that the employer's asserted reason is mere pretext for racial discrimination. See *Davis v Dallas Area Rapid Transit*, 383 F3d 309, 316–17 (5th Cir 2004); see also *Texas Tech University Health Sciences Center–El Paso v Flores*, 612 SW2d 299, 305 (Tex 2020) (applying framework to TCHRA claims). This same framework will apply to the claims for disability discrimination and retaliation.

i. *Prima facie* case

A *prima facie* case of race discrimination requires the employee to demonstrate that (i) she is a member of a protected class, (ii) she was qualified for the position, (iii) she suffered an adverse employment action, and (iv) she was replaced by someone outside her protected class or treated less favorably than other similarly situated employees outside her class. *Bryan v McKinsey & Co Inc*, 375 F3d 358, 360 (5th Cir 2004); see also *Harris County Hospital Director v Parker*, 484 SW3d 182, 196 (Tex App—Houston [14th Dist] 2015, no pet).

Dispute here focuses only on whether Thomas was treated less favorably than other similarly situated employees outside her class. Thomas points to four such employees, all of whom are White. See Dkt 38 at 12–15. United argues that none of them are in fact similarly situated. Dkt 36 at 17–20.

The Fifth Circuit instructs that a similarly situated employee must present "nearly identical circumstances" to the plaintiff. *Lee v Kansas City Southern Railroad Co*, 574 F3d 253, 260 (5th Cir 2009) (citations omitted). This is a high bar to meet, requiring proof that the two employees "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." Ibid. Texas law follows the same standard. *Flores*, 612 SW2d at 312.

The most similar employee Thomas presents is Shannon Giannette, whose surname is sometimes identified in briefing as Gillette. Like Thomas, Giannette submitted falsified documents to United. Unlike Thomas, her employment wasn't terminated. But the evidence shows that these distinct employment actions weren't taken under nearly identical circumstances. First, Thomas and Giannette didn't share the same supervisor and so the incidents under investigation proceeded differently. Second, the documents in Giannette's case were submitted for seeking to have her FMLA status certified—not to cover a sick call after FMLA status was previously established. Third, Giannette didn't submit the documents in connection with a potential pass-travel violation. And fourth, Giannette cooperated with United's investigation and ultimately admitted to wrongdoing. Dkt 36-1 at 61–64. Thomas by contrast failed to cooperate, which was part of the reason for her termination. Id at 49–51.

The three other employees Thomas presents are even less similar than Giannette. Donna Shultz did have Holmes for her supervisor, but her alleged misdeed was (Thomas says) threatening Thomas with a knife. Dkts 36-1 at 65–67 & 36-2 at 12. That's nowhere near identical to the circumstances resulting in Thomas's termination. As for Kymmy Hucks and Holly Olive, Holmes supervised neither—which distinguishes each from the outset. In addition, although Hucks was found to have committed a pass-travel violation, she didn't submit falsified documents or lie about visiting a hospital. Dkt 36-1 at 60. And Olive was merely permitted to leave a meeting for medical reasons. She has no reported violation history for which termination may have been warranted.

Having failed to identify a similarly situated employee, Thomas can't show a *prima facie* case of race discrimination.

ii. Pretext

Even if Thomas had established a *prima facie* case, she hasn't presented evidence to show that United's purported

legitimate, non-discriminatory reasons for terminating her employment were a pretext for discrimination.

To establish pretext, an employee must show that "the employer's proffered explanation is unworthy of credence." *Reeves v Sanderson Plumbing Products Inc*, 530 US 133, 143 (2000) (quotation marks and citation omitted). In other words, the explanation "is not the real reason for the adverse employment action." *Burton v Freescale Semiconductor Inc*, 798 F3d 222, 233 (5th Cir 2015) (quotation marks and citation omitted). The employee "must rebut each discrete reason proffered by the employer." Ibid. Texas law has a somewhat lower standard, requiring proof that race was a motivating factor for the adverse employment action, even if not the only factor. *Quantum Chemical Corp v Toennies*, 47 SW3d 473, 479–80 (Tex 2001).

United's proffered reasons for termination are perfectly legitimate—lying, falsifying documents, and failing to cooperate in its investigation. And there's nothing casting these reasons into doubt. For her part, Thomas sponsors no evidence indicating that her race was the real reason for her termination or that it was even a motivating factor.

In short, nothing in the record indicates that race was in the mind of any employee who participated in the termination process. Indeed, two of the principal employees who participated in that process were in the same protected class as Thomas—Holmes and Michael Mayo—with the former having led the investigation, and the latter having made the ultimate termination decision. See *Agoh v Hyatt Corp*, 992 F Supp 2d 722, 744 (SD Tex 2014): "When decision makers are in the same protected class as the plaintiff, there is a presumption that unlawful discrimination is not a factor in the discharge."

Summary judgment will be granted on the claims for race discrimination under both federal and Texas law.

b. Disability discrimination

Thomas also brings claims for disability discrimination under the ADA and TCHRA. See 42 USC § 12112; Texas

Labor Code § 21.051. The *McDonnell Douglas* framework again pertains. See *Caldwell v KHOU-TV*, 850 F3d 237, 241 (5th Cir 2017); see also *Quantum Chemical*, 47 SW 3d at 476–77, 479–80.

i. *Prima facie* case

To establish a *prima facie* case of disability discrimination, the plaintiff must show that she (i) has a disability, (ii) was qualified for the job she held, and (iii) was "subject to an adverse employment decision on account of [her] disability." *EEOC v LHC Group Inc*, 773 F3d 688, 697 (5th Cir 2014); see also *Donaldson v Texas Department of Aging & Disability Services*, 495 SW3d 421, 436 (Tex App—Houston [1st Dist] 2016, pet denied). The third element requires proof of "a causal connection between an adverse employment action and [the employee's] disability." *Rodriguez v Eli Lilly & Co*, 820 F3d 759, 765 (5th Cir 2016).

United correctly argues that Thomas has failed to raise a fact issue as to causation. Dkt 36 at 23–24. Much of Thomas's argument on causation is keyed to the actions of Holmes, who supposedly discriminated against Thomas by commencing the investigation that led to her termination. But by her own admission, Thomas didn't tell Holmes that she had ulcerative colitis before this investigation began. See Dkt 36-2 at 17–18 (Thomas deposition). This means that there's no evidence that Holmes even knew that Thomas had a disability when she started the investigation.

Thomas contends that Holmes did indeed "ha[ve] knowledge of Plaintiff's disability," noting that Thomas had exercised her FMLA leave while working under Holmes. Dkt 40 at 3. But she doesn't cite any pertinent record evidence supporting these assertions. And in any event, documents demonstrating that Thomas had FMLA status don't indicate that *Holmes* was aware that Thomas had ulcerative colitis. See Dkt 38-7.

Nor would knowledge of Thomas's disability in itself demonstrate a causal connection. Thomas has had

ulcerative colitis since at least 2017. Thomas identifies no evidence indicating that Holmes had, since that time, issued poor performance reviews related to her ulcerative colitis or the leave it sometimes required her to take. She thus doesn't muster a potential showing that Holmes was searching for a reason to fire her because of her condition. To the contrary, see *EEOC v Chevron Phillips Chemical Co*, 570 F3d 606, 623 (5th Cir 2009) (determining that evidence could support such conclusion in that case). Nor does she show that Holmes or anyone else made comments casting doubt on her value to the company because of her condition. To the contrary, see *EEOC v LHC Group Inc*, 773 F3d 688, 701 (5th Cir 2014) (determining that comments of such nature can create fact issue on causation). The only evidence indicating potential hostility by Holmes toward Thomas in spite of her disability comes from Thomas herself. See Dkt 38-11 at 3. It's thus self-serving and, without corroboration, insufficient to create a triable issue of fact. See *Salazar v Lubbock County*, 982 F3d 386, 389 (5th Cir 2020).

The timing matters, too. Holmes didn't initiate an investigation into Thomas's conduct on a whim. She initiated an investigation only after Thomas had—by an assertedly remarkable coincidence—called in sick on the same day that she booked a standby reservation for travel. Such conduct certainly suggests that Thomas had engaged in a pass-travel violation, which United policy expressly states may be investigated. Dkt 36-1 at 47.

And while Thomas primarily focuses on Holmes, she wasn't the only United employee involved in the termination process. In fact, Mayo made the ultimate decision on her termination, not Holmes. But Thomas has no evidence that any of these other employees (including Mayo) took into account Thomas's disability at any point.

Thomas can't show a causal connection between her disability and the decision by United to terminate her employment. This means that she hasn't established a *prima facie* case under either the ADA or TCHRA.

ii. Pretext

Beyond this, Thomas hasn't presented evidence showing that United's proffered reasons for terminating her employment were a pretext for disability discrimination.

Thomas baldly states that "but for Plaintiff's disability . . . Ms. Holmes would not have launched her crusade against Plaintiff. But for Plaintiff's UC, Ms. Holmes would not have initiated her meritless investigation into Plaintiff's attendance." Dkt 38 at 18. The problem is, no exhibits are cited in support of these conclusory assertions. And as just indicated, Thomas has submitted no evidence from which a reasonable jury could conclude that Thomas's disability motivated Holmes to initiate the investigation into Thomas's behavior.

Likewise, as determined further above, United's proffered reasons for termination are perfectly legitimate—lying, falsifying documents, and failing to cooperate in its investigation. Nothing casts these reasons into doubt, and Thomas musters nothing to indicate that her ulcerative colitis was the real reason for her termination or that it was even a motivating factor.

Summary judgment will be granted on the claims for disability discrimination under the ADA and TCHRA.

c. Failure to accommodate

Thomas also brings claims for failure to accommodate under the ADA and TCHRA. See 42 USC § 12112; Texas Labor Code § 21.128. Such claim requires proof that (i) the plaintiff has a qualifying disability, (ii) the employer knew of the disability and its consequential limitations, and (iii) the employer failed to make reasonable accommodations for such known limitations. *Feist v Louisiana, Department of Justice, OAG*, 730 F3d 450, 452 (5th Cir 2013); see also *Dillard v SNC-Lavalin Engineers & Constructors Inc*, 629 SW3d 692, 697 (Tex App—Houston [1st Dist] 2021, no pet).

Thomas claims that United, through Holmes, denied her requested accommodations to use the restroom during

the August 6th meeting and to reschedule the August 16th meeting. Among other things, United argues that the failure-to-accommodate claim must fail because Thomas can't show that Holmes knew of Thomas's condition or its symptoms when Thomas requested these accommodations. Dkt 36 at 27. It also argues that Thomas didn't participate in the required interactive process for either requested accommodation. Dkts 36 at 28 & 25 at 5–9. Both arguments are correct.

*As to notice,* the summary judgment evidence doesn't demonstrate that Holmes (as the person who participated in the interactive process on behalf of United) knew that Thomas had ulcerative colitis—or perhaps more importantly, knew of its consequential limitations (such as stool urgency). See Dkt 36 at 27–28. Again, that Thomas had FMLA status and exercised FMLA leave in the past isn't enough. Thomas hasn't provided evidence that such status would have made Holmes or anyone else at United aware of such limitations. However unpleasant, it was thus incumbent on Thomas to explain her disability and its consequential limitations so that Holmes could fully consider whether accommodations were warranted. It isn't enough merely to state, as she did, "I have a condition." See Dkt 36-2 at 17–18.

*As to interactive process,* "Reasonable accommodation under the ADA is a process, not a one-off event." *Scheidler v Indiana*, 914 F3d 535, 542 (7th Cir 2019). "[F]or an employer to be liable under the ADA for failure to accommodate limitations caused by an employee's disability, courts have widely held that the employee must request accommodation from the employer and participate in an 'interactive process' with the employer to arrive at a suitable accommodation." *Tullos v City of Nassau Bay*, 137 F Appx 638, 646 (5th Cir 2005) (citations omitted). The interactive process "should be an ongoing, reciprocal process, not one that ends with the first attempt at accommodation." *Dillard v City of Austin*, 837 F3d 557, 562 (5th Cir 2016) (citation omitted). And an employer may be held liable under the ADA when it refuses "to engage in a

good faith interactive process"—but not when breakdown in the process "is traceable to the employee." *Loulseged v Akzo Nobel Inc*, 178 F3d 731, 736 (5th Cir 1999).

Here, the purported accommodation requests by Thomas were vague in terms of both condition and potential consequences. For example, see Dkt 36-2 at 15–16 (Thomas deposition). Such circumstances thus didn't lend themselves to the back-and-forth expected in providing accommodations under the ADA. Holmes was forced to make an on-the-spot decision about whether to permit Thomas to use the restroom in one instance, and whether to reschedule a meeting in the other. Each was a "one-off event," ending "with the first attempt at accommodation." *Scheidler*, 914 F3d at 542; *Dillard*, 837 F3d at 562. No liability attaches for refusal to accommodate in circumstances of such transient nature that don't comprehend an interactive process even taking place.

Summary judgment will be granted on the claims for failure to accommodate under the ADA and TCHRA.

d. Retaliation

Thomas lastly brings claims for retaliation under the ADA, Title VII, and the TCHRA. See 42 USC § 2000e-3(a) (Title VII); 42 USC § 12203(a) (ADA); Texas Labor Code § 21.055. She asserts that United retaliated by firing her for engaging in two protected activities: complaining of discrimination and requesting accommodations. See Dkt 38 at 20.

The *McDonnell Douglas* framework again applies. *Feist*, 730 F3d at 454 (Title VII and ADA); *Alamo Heights Independent School District v Clark*, 544 SW2d 755, 764, 782 (2018) (TCHRA). The parties dispute only whether Thomas has submitted evidence to create a fact issue as to pretext.

To avoid summary judgment as to the pretext inquiry on retaliation claims, "the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Feist*, 730 F3d at 454. But Thomas

hasn't submitted any evidence supporting a conclusion that United's decision to terminate her was in any way motivated by (i) the fact that she had complained of discrimination in the past, *before* she had engaged in a possible pass-travel violation and submitted what United concluded to be falsified documents, or (ii) the fact that she requested accommodations, *after* the investigation itself had started. She thus hasn't met her burden of showing that United's stated termination reasons were a pretext for retaliating against her for engaging in protected activities.

Summary judgment will be granted on the claims for retaliation under Title VII, the ADA, and the TCHRA.

e. Follow-on consequences

To satisfy its burden under *McDonnell Douglas*, United presented three legitimate, non-discriminatory reasons for terminating Thomas, being that she (i) lied about visiting the hospital on July 20th, (ii) submitted falsified discharge papers to support this purported visit, and (iii) failed to participate in United's investigation. It substantiated the first two reasons at the outset of its motion with convincing evidence that Thomas didn't visit the hospital on July 20th and that the discharge papers she submitted were indeed falsified. Dkt 36 at 7–8; see also id at 13–16. This includes evidence that HCA employees said Thomas wasn't seen at the emergency room on the 20th. See Dkt 36-1 at 56–57; see also 36-3 & 36-4. It also includes evidence that the discharge papers Thomas submitted for the July 20th visit bore the account number from the overnight visit for August 13th and 14th—a clear indication of forgery. See Dkts 36-1 at 32 & 36-6.

For whatever reason, Thomas continued to insist throughout United's investigation that the discharge papers she submitted with respect to the July 20th visit were legitimate. It would be one thing if she'd left that as a dispute between employer and employee. But her insistence on that fiction poses an entirely different category of problems in this litigation. And that is because Thomas swore an oath to tell the truth in her deposition, subject to penalties of perjury, and then testified, "I

absolutely did not forge the document." Dkt 36-2 at 43. And she further testified that she "certainly" was at the hospital on July 20th. Id at 40. Likewise, her declaration submitted with her response, also subject to penalty of perjury, flatly averred, "After leaving the airport, on July 20, 2019, I visited the hospital as a result of my ulcerative colitis." Dkt 38-11 at 3.

To the contrary, the evidence on the present record leaves little doubt, if any at all, that Thomas knowingly lied during her deposition and in her declaration about a fact that is central to this case and critical to United's defense.

Claims under Title VII and the ADA are serious. They concern allegations of conduct that—where true—are rightly and strongly condemned. And litigation isn't a game. It's a serious matter in pursuit of justice, which of its nature depends on an honest and legitimate search for the truth. Where that's subverted without consequence, the rule of law is itself denuded. For this reason, Section 1621 of Title 18 of the United States Code in relevant part provides:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . . is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both.

The United States Supreme Court has long observed, "Perjury is an obstruction of justice; its perpetration well may affect the dearest concerns of the parties before a tribunal." *United States v Norris*, 300 US 564, 574 (1937).

The Fifth Circuit is of similar sentiment, noting that the oath taken before a deposition "is not trivial. The proper administration of justice depends on people testifying truthfully under oath." *Brown v Oil States Skagit Smatco*, 664 F3d 71, 77 (5th Cir 2011). And the Seventh Circuit aptly notes that "the judicial system cannot tolerate deception from litigants." *Neal v LaRiva*, 765 F3d 788, 790 (7th Cir 2014).

Deception here began with Thomas during the investigation by United. Would that it ended there. But it didn't. Instead, it plainly involves the additive and amplifying conduct of her counsel, the Kennard Law Firm. It is they who have brought to bear the courts and system of justice that wrongfully targeted United in this action.

Rule 11(a) of the Federal Rules of Civil Procedure requires that at least one attorney of record sign all filings made on behalf of a client. This is given force and effect by Rule 11(b), which states:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) *it is not being presented for any improper purpose*, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) *the claims, defenses, and other legal contentions are warranted by existing law* or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) *the factual contentions have evidentiary support* or, if specifically so identified, will likely have evidentiary

support after a reasonable opportunity for further investigation or discovery; and

(4) *the denials of factual contentions are warranted on the evidence* or, if specifically so identified, are reasonably based on belief or a lack of information.

FRCP 11(b) (emphasis added).

All of the following statements made by the Kennard Law Firm in response and surresponse to United's motion are fully subject to Rule 11:

- "*Plaintiff never falsified any documents nor did she lie about visiting the hospital*, yet Plaintiff was terminated due to these *false* accusations." Dkt 38 at 15–16 (emphasis added).
- Stating that Thomas was "*wrongfully* accused of forgery and dishonesty pertaining to documentation of her prior hospital visit." Id at 11 (emphasis added).
- Insisting that Thomas "was *falsely* accused of forging documents." Id at 13 (emphasis added).
- Stating that Holmes "initiated a *false* investigation against" Thomas. Id at 17 (emphasis added).
- "At no point has Plaintiff conceded Defendant's stated reason for termination; Plaintiff has maintained, that while supposed forgery and dishonesty were the reasons for termination cited by Defendant, *she has committed no such acts*." Dkt 44 at 1 (emphasis added).

By such statements, the Kennard Law Firm has flatly vouched for a perjurious version of the facts in response to the subject motion. And such deception pertains to a topic material to disposition of Thomas's claims in this action. By stating that Thomas was falsely accused of forgery and by continuing to insist that she visited the hospital on July 20th, the Kennard Law Firm is plainly contesting the legitimate, non-discriminatory reasons for terminating Thomas that United presented to satisfy its burden under

*McDonnell Douglas*. And it's also attempting to bolster arguments concerning Thomas's *prima facie* case. See Dkt 38 at 17 (causation).

Quite glaring in this respect—especially given the stark and heavy emphasis placed upon it by United—there's no attempt at all in response to explain *why* HCA employees said Thomas wasn't at the hospital on July 20th, or *how* her submitted discharge papers purportedly for that day came to bear the account number from the overnight visit of August 13th and 14th. See Dkts 38 & 44. The Kennard Law Firm is thus complicit, having sponsored an argument in briefing wholly dependent upon perjured testimony and forged documents. This is contrary to the commands of Rule 11(b)(3) & (4). Indeed, this litigation wouldn't have proceeded to this point but for that conduct by this law firm. And more, Thomas, as the client, likely wouldn't have been emboldened to believe that false testimony under oath could proceed without consequence.

A first step in the inquiry will thus be as to what, if any, sanction is appropriate to impose upon the Kennard Law Firm. United is instructed below that it may, if desired, bring a motion under Rule 11(c) for sanctions against the Kennard Law Firm for the entirety of its legal fees and expenses expended in this litigation, or any lesser amount that can properly be established under the law.

Reserved at present, but nonetheless under advisement, is whether to refer this order and case file to the United States Attorney for the Southern District of Texas, so that he may consider whether Thomas should be prosecuted for the crime of perjury or any other offense that he deems appropriate. For example, see *Neal*, 765 F3d at 791; *A.V. by Versace Inc v Gianni Versace SpA*, 446 F Supp 2d 252 (SDNY 2006); *Brown & Brown Inc v Ali*, 592 F Supp 2d 1009, 1051 (ND Ill 2009). United may in its motion state whether it believes such reference is appropriate in this instance, with citation of authority in support.

The Kennard Law Firm will have an opportunity in response to present for consideration any argument in contravention or mitigation of sanctions. See FRCP 11(c).

4. Conclusion

The motion by Defendant United Airlines for summary judgment is GRANTED. Dkt 36.

Its partial motion to dismiss is DENIED AS MOOT. Dkt 25.

This action will be DISMISSED WITH PREJUDICE. Final judgment will enter on a later day. The matter will at present be retained on the docket to consider whether and the extent to which sanctions are warranted in this litigation.

United Airlines is INSTRUCTED that it may, if desired, bring a motion for sanctions against the Kennard Law Firm for the entirety of its legal fees and expenses expended in this litigation, or such lesser amount as appropriate under Rule 11. It may also state whether it believes reference of Plaintiff Kim L. Thomas to the United States Attorney for the Southern District of Texas is appropriate, with citation of authority in support.

Such motion must be brought within a reasonable time not to exceed twenty-one days, absent reasonable extension received upon request. United may in this respect request reasonable discovery and attendant deadlines necessary to a well-founded motion.

SO ORDERED.

Signed on March 31, 2023, at Houston, Texas.



Hon. Charles Eskridge
United States District Judge

United States District Court
Southern District of Texas
**ENTERED**
June 20, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| KIM L. THOMAS, Plaintiff, | § | CIVIL ACTION NO 4:21-cv-01301 |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| UNITED AIRLINES INC, Defendant. | § | |

**ORDER OF SANCTIONS AND REFERENCE TO THE UNITED STATES ATTORNEY**

Plaintiff Kim L. Thomas brought several claims against Defendant United Airlines Inc under Title VII, the ADA, and their state equivalents. Dkt 21. An order granting summary judgment in favor of United Airlines entered in March 2023. Dkt 47. That order detailed mendacious behavior by Thomas before and after she filed suit, along with complicit and amplifying behavior by her counsel, the Kennard Law Firm. See id at 15–20.

As summarized there, with citation here to the pertinent underlying filings, Thomas insisted throughout this litigation (and before it even started) that she visited a specific hospital on July 20, 2019. This was no small factual detail but was instead central to the dispute that she chose to initiate against United Airlines. She then testified under oath at her deposition that she visited the hospital, while also swearing to having done so in an affidavit. See Dkts 36-2 at 43 & 38-11 at 3.

The Kennard Law Firm also vouched for this fact in briefing filed on behalf of Thomas. The firm made this representation of fact not only when contesting whether United Airlines had met its burden under *McDonnell*

*Douglas*, but also when arguing that a fact issue existed as to pretext—both material components of her claims for discrimination and retaliation. For example, see Dkts 38 at 13, 15–16, 17–19, 21 & 44 at 1, 4–5. As to *McDonnell Douglas*, the Kennard Law Firm even stated in a surresponse, “At no point has Plaintiff conceded Defendant’s stated reason for termination; Plaintiff has maintained that, while supposed forgery and dishonesty were the reasons of termination cited by Defendant, she has committed no such acts.” Dkt 44 at 1.

For its part, United Airlines submitted substantial and persuasive evidence that Thomas didn’t visit the hospital on July 20th, and that she instead later forged discharge papers purporting to show that she did. This included evidence that employees of the hospital informed United Airlines that no records existed of Thomas having been there on July 20th. See Dkt 36-1 at 56–57; see also 36-3 & 36-4. It also included evidence that the discharge papers submitted by Thomas to establish the purported visit on July 20th bore a unique account number from a separate, overnight visit that occurred on August 13th and 14th. See Dkts 36-1 at 32 & 36-6. Throughout summary judgment practice, Thomas in no way attempted to rebut or refute with evidence what United Airlines had shown.

Because of these concerns, the order granting summary judgment allowed United Airlines to move for sanctions against the Kennard Law Firm under Rule 11 of the Federal Rules of Civil Procedure. Dkt 47 at 20. It also permitted United Airlines to state in any such motion whether it believed that reference of Thomas to the United States Attorney for the Southern District of Texas for inquiry into potential perjury was appropriate. Ibid.

Now pending is a motion by United Airlines requesting (i) sanctions against the Kennard Law Firm in the amount of $52,287.72, as the entirety of its fees and expenses incurred in defending against the claims in this action; and (ii) reference of Thomas to the United States Attorney. Dkt 48.

The Kennard Law firm hasn't responded to the pending motion on behalf of either itself or its client. Its failure to respond is treated in the Southern District of Texas "as a representation of no opposition." LR 7.4.

Rule 11(b) states in full:

> REPRESENTATIONS TO THE COURT. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Rule 11(c) then further provides that district courts have authority to "impose an appropriate sanction" for violations of Rule 11(b).

In light of the evidence presented by United Airlines and available to Thomas and her counsel before this lawsuit began, the Court FINDS that the Kennard Law Firm (i) in violation of Rule 11(b)(3), submitted factual contentions in briefing that lacked minimal evidentiary support, and (ii) in violation of Rule 11(b)(4), made denials of factual contentions that could in no way be warranted on the available evidence.

Specifically, the Kennard Law Firm affirmatively asserted in briefing on summary judgment that:

- “On July 20, 2019 Plaintiff planned for travel using her United travel benefits. ... While waiting to fly standby, Plaintiff began to experience UC symptoms. Plaintiff, unable to travel in her condition, did not use any United travel pass that day. *Rather, on July 20, Plaintiff went to the hospital as a result of her UC.*” Dkt 38 at 9–10 (emphasis added; record citations omitted).
- “In early October 2019 meeting, Plaintiff was *wrongfully* accused of forgery and dishonesty pertaining to documentation of her prior hospital visit.” Id at 11 (emphasis added).
- “Plaintiff *never* falsified any documents nor did she lie about visiting the hospital, yet Plaintiff was terminated due to these *false* allegations.” Id at 15–16 (emphasis added).
- “Defendant argues that Plaintiff’s employment was terminated because she supposedly (i) falsely stated that she went to the emergency room, (ii) submitted a falsified document to support this visit, and (iii) refused to cooperate with Defendant’s investigation. *Note that, Plaintiff has proof that she was at the hospital on the day in question.*” Id at 18 (emphasis added; record citations omitted).
- “While Defendant cites forgery and dishonesty as its reasons for terminating Plaintiff, *these*

*reasons are merely pretextual*. Plaintiff has proof that she was at the hospital on the day in question." Id at 21 (emphasis added; record citations omitted).

- "At no point has Plaintiff conceded Defendant's stated reason for termination; Plaintiff has maintained, that while supposed forgery and dishonesty were the reasons of termination cited by Defendant, *she has committed no such acts*." Dkt 44 at 1 (emphasis added).
- "While Plaintiff did go to the airport with the intention to travel, she never ended up traveling due to an UC flare. *This is evidenced by documentation showing that Plaintiff went to the hospital on July 20th*." Id at 4 (emphasis added).
- "While Plaintiff had planned to travel, Plaintiff did not actually travel on July 20, 2019, due to her UC. Plaintiff was at the airport, *but ultimately left and went to the emergency room that day*. Plaintiff did not call out sick and then attempt to use a travel pass, rather, Plaintiff intended to use a travel pass, suffered an UC flare, did not use the pass, and then subsequently reported to Defendant that she had been ill." Id at 5 (emphasis added).

The Court additionally FINDS that substantial evidence establishes that Thomas did indeed falsify documents and lie about visiting the hospital. Given the evidence that United Airlines has put forward all along the way, both prior to and during this litigation, the Kennard Law Firm could not merely accept as true and trustworthy allegations such as those made by Thomas and on that basis present them to a federal court. Rule 11(b) instead requires "an inquiry reasonable under the circumstances." Because the Kennard Law Firm has chosen not to respond to the motion, the Court FINDS that the Kennard Law Firm concedes that it failed to undertake any such reasonable inquiry into the allegations made by its client.

Because the Kennard Law Firm has chosen not to respond to the motion, the Court additionally FINDS that the Kennard Law Firm has also conceded that it initiated and maintained this lawsuit without any good-faith basis under Rule 11(b)(1) and (b)(2). In this regard, the Court also FINDS that the amended complaint was made without reasonable investigation and minimal evidentiary support for the improper purpose of harassing United Airlines, and that the claims and legal contentions asserted on behalf of Thomas were in no way warranted by existing law. Dkt 21.

The Court additionally FINDS that such conduct warrants sanctions under Rule 11 against both the Kennard Law Firm and Ellen Sprovach, the attorney designated on the docket as responsible for this matter. See FRCP 11(c)(1): "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."

Thomas was the source of the falsehoods that the Kennard Law Firm sponsored and amplified in briefing and evidence. See Dkt 47 at 15–17. She testified under oath that she "absolutely did not forge" her discharge papers and that she was "certainly" at the hospital on July 20th. See Dkt 36-2 at 40, 42. She made similar representations in a sworn declaration. Dkt 38-11 at 3.

The Court FINDS that these sworn statements go to a material element of her discrimination claims. And as already explained above, the Court additionally FINDS that clear and persuasive evidence submitted by United Airlines shows that these statements were not merely false, but of their nature were knowingly false.

Misrepresentations such as these, when knowingly made in the course of litigation, come with consequences. The Fifth Circuit observes, "The proper administration of justice depends on people testifying truthfully under oath." *Brown v Oil States Skagit Smatco*, 664 F3d 71, 77 (5th Cir 2011). And as stated by the Seventh Circuit, "the judicial system cannot tolerate deception from litigants." *Neal v LaRiva*, 765 F3d 788, 790 (7th Cir 2014).

The Court thus FINDS that reference to the United States Attorney for further consideration as to perjury and/or the submission of false documents is warranted. Accord *Neal*, 765 F3d at 791; *Brown & Brown Inc v Ali*, 592 F Supp 2d 1009, 1051 (ND Ill 2009); *A.V. by Versace Inc v Gianni Versace SpA*, 446 F Supp 2d 252, 276–77 (SDNY 2006); *Devine v Wal-Mart Stores Inc*, 52 F Supp 2d 741, 746, n 7 (SD Miss 1999).

With this referral, it must again be noted that the Kennard Law Firm declined entirely to respond—on behalf of either itself or its client—to the motion by United Airlines. As such, it briefed no defense or explanation of Thomas's conduct to this Court. What advice or encouragement, if any, that the Kennard Law Firm gave to Thomas concerning the conduct under consideration is thus unknown. The United States Attorney should consider, if believed appropriate (i) whether the conduct of the Kennard Law Firm itself implicates the prohibitions of 18 USC § 1621 or any similar statute, and (ii) whether the advice or explanations given by the Kennard Law Firm to Thomas provide any defense or otherwise affect the exercise of prosecutorial discretion as to her.

* * *

The motion by Defendant United Airlines Inc for sanctions and reference to the United States Attorney is GRANTED. Dkt 48.

The Kennard Law Firm and Ellen Sprovach are jointly ORDERED to pay United Airlines $52,287.72 in attorney fees and costs by June 30, 2023.

The Clerk is ORDERED to send copies of this order, the order granting summary judgment (Dkt 47), and the case file to the United States Attorney for the Southern District of Texas so that he may consider whether Plaintiff Kim L. Thomas and/or the Kennard Law Firm should be prosecuted for the crime of perjury, under 18 USC § 1621, or any other offense that he deems appropriate.

A final judgment will enter by separate order.

SO ORDERED.

Signed on June 16, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge

**IN THE UNITED STATE DISTRICT COURT**
**FOR SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **KIM L. THOMAS** | § | |
| | § | |
| | § | |
| | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.: 4:21-CV-01301** |
| | § | |
| **UNITED AIRLINES, INC.** | § | |
| | § | |
| ***Defendant*.** | § | **JUDGE CHARLES ESKRIDGE** |

**ELLEN SPROVACH'S RESPONSE TO THIS COURT'S JUNE 23, 2023, ORDER and MOTION FOR RECONSIDERATION**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

ELLEN SPROVACH files this, her individual response to this Court's June 23, 2023, Order. Ellen Sprovach files this individual response because she resigned from and left Alfonso Kennard Jr.'s law firm, Kennard Law, PC. Ellen Sprovach has not had an employment relationship with Kennard Law since March 15, 2023. Plaintiff in this case hired Alfonso Kennard, Jr. to represent her in the instant matter Kennard continues to represent Ms. Thomas; Sprovach does not. Naturally, Sprovach had no access to Kennard Law email assigned to her that rolled over to Kennard for notices from this case after she quit.

Kennard received this Court's emails and intentionally ignored this Court's Show Cause Order and Defendant's Motion for sanctions although he continued to represent Ms. Thomas. Kennard lied to this Court throughout his June 29, 2023, response. The undersigned discovered that Kennard is currently ignoring Judge Eskridge's Orders in another case as well.[1]

[1] Case No. 4:22-cv-01096. (please note the undersigned's email was only automatically put on that case by the system after Sprovach was able to recover her personal Federal login. Sprovach's email was not there prior to June 2023).

The appearance of impropriety is, in the undersigned's eyes, as bad as impropriety itself. The undersigned learned this in her first year of law school and agree and strives to that end. Ellen Sprovach apologizes to this Court for the appearance that she ignored a response to Defendant's Motion for Sanctions. Ellen Sprovach apologizes to the Court for the appearance that she failed to respond to its Show Cause Order. She did not ignore it either. She did not, and would never, fail to respond.

**Ellen.Sprovach@Kennardlaw was in the sole custody and control of Kennard after Sprovach was forced to resign.**

As a former employee of Kennard Law when both of those filings were entered, Sprovach would not have and did not receive notification of this Court's Show Cause Order or Defendant's Motion for Sanctions. Those notifications went to Sprovach's previous Kennard Law email address, solely owned by Alfonso Kennard. Alfonso Kennard, Jr. chose to ignore this Court, to his client's detriment and did not respond.

**Kennard directed his staff to take him of all Court cases on December 23, 2023.**

A backstory also exists as to why Ellen was listed by Kennard as the sole counsel in this case. On December 23, 2023, Kennard gave directions to staff at his law firm to drop everything they were working on and all hands were on deck to go into every case of the firm in any court and remove him from the case. Kennard's June 29, 2023, pleading, Exhibit A, page 1. This was done as a desperate attempt for Kennard to try to avoid letting judges, clients and opposing counsel know that his law license was being suspended for 30 days.

Kennard directed all staff to work as late as it takes to file these designations under Ellen Sprovach's unique and personal bar number and attorney account. Sprovach herself was not part of this filing activity as she was driving to Kansas City for Christmas with her family. Exhibits 1;

Declarations of Michelle Sanchez and Meggan Grayson, former Kennard employees. Kennard's Exhibit A, page 1.

**Why did Kennard's actions forced Sprovach and almost the entire firm to quit.**

To add insult to injury the staff who dropped everything to file these designations did not finish until around 9 pm a day and a half before Christmas. Alfonso wholly failed to pay these employees. Kennard was always late with payroll but in December wholly failed to meet payroll at all. These poor people who put up with crazy, were required to engage in this activity that interfered with their holidays and then he did not pay them. Six employees quit because Alfonso failed to pay them beginning in December. This was the majority of the staff. Loyal and hard-working staff were forced to file wage claims (after having gone without pay through Christmas). They all won. Alfonso chose only to pay two of the employees anything. The rest remain unpaid.

And that is largely why the undersigned was forced to quit.[2] Sprovach stayed as long as she could for clients but Alfonso failed to pay her even my base salary for over three months. Kennard never paid the bulk of her shared compensation at all. [3] All the following happened in the first 3 months of 2023: Health insurance was cancelled. Kennard's firm was evicted from its office and he never told any staff about this, clients had to (the office staff was largely remote Email was turned off for two days in February. The website and case leads was removed for non-payment. He no longer had support staff. Case filings were declined for bad credit cards. Sprovach was forced to use her personal credit card to pay client's court filing fees.

**Sprovach sent ten (10) formal written requests to Kennard to take her off case filings.**

---

[2] While things were spiraling out of control at the firm throughout 2022 and into 2023, on January 3, 2023, the Firm's Operations Director texted Kennard to tell him his actions, particularly in removing firm funds were causing large problems to the firm and the morale of the staff. Exhibit 2, text from the Operations Director to Kennard.

[3] Please see Exhibit 3, Declaration of Cristabel Jimenez, former Kennard attorney regarding Kennard's allegations in his false June 29, 2023, pleading to this Court. In full disclosure the undersigned currently works with Ms. Jimenez as she reached out after she learned Sprovach was forced to quit. The young lawyer saved the older attorney. It is humbling and very, very appreciated.

In her resignation letter, Sprovach explicitly requested Kennard file the appropriate motions in each of her cases upon her departure. Kennard failed to respond to the resignation letter. On ten (10) subsequent occasions, Sprovach sent formal written requests asking Kennard Law to file the requisite documents in cases indicating she was no longer affiliated and that Kennard was counsel. Kennard failed to respond and failed to file any such designations. Exhibit 4, 10th Request.

**Kennard lied to this Court in his June 29, 2023, pleading.**

Kennard is lying to this Court in his June 29, 2023, pleading when he states that Sprovach received notification of cases she had worked on at Kennard after she left. Kennard must think this Court will fall for his idea that an employee who quit and no longer works for the firm, maintains no legal relationship with the client, that the former employee would somehow respond to the motions and Show Cause Order in this case. You can tell by Kennard's words that even he does not believe his own argument.

In this case and every Federal case that was open and Kennard put Sprovach's name and bar number affiliated with it, the notification **went to Kennard Law and only Kennard Law** from March 15, 2023, until June 20, 2023. Sprovach was only able to recover her personal login from Pacer and Southern District ECF with documented technical help.[4] All notifications in this case went to Ellen.Sprovach@Kennardlaw.com between March 15, 2023, and June 20, 2023. That email was in the sole custody and control of Alfonso Kennard, Jr. It was Alfonso Kennard, Jr. who wholly failed to respond to Defendant's Motion for Sanctions and this Courts subsequent Show Cause Order.

It was only on June 20, 2023, when Sprovach filed her advisory into this case that the system put her with her updated personal attorney log in into this case. This is contrary to all the

[4] Please see Exhibit 5, showing that Sprovach only recovered her Federal Pacer/ECF logins on June 5, 2023.

lies in Kennard's June 29, 2023, pleading.

Kennard stated on page one of his pleadings that Sprovach specifically requested to be lead attorney in this case. This was probably the biggest lie Kennard told this Court. The undersigned directs this Court again to the two declarations by former employees Michelle Sanchez and Meggan Grayson stating that they were directed to take Kennard off all cases in Courts and make Sprovach or the other attorney the sole and lead counsel.

Kennard knows very well that Sprovach's Kennard Law email rolled over to the firm after she left, yet he lies to the Court and says that Sprovach, again on page one, had her personal email on cases. That is wholly false. The ECF automatically put Sprovach's personal email on this case notification page only beginning June 20, 2023, when she filed her advisory. Until that point, all Plaintiff email notifications in this case went to Kennard, himself. Sprovach's personal email address was not affiliated with this case.

Kennard tells this Court, laughably, that Sprovach was going to reply to the motion for sanctions in this case, after she quit. That lie speaks for itself. Who just casually replies to a motion for a firm after they quit and without having a relationship with the client? NO ONE.

Kennard lied to the Court that Sprovach specifically requested that she be the sole counsel for this case. That lie could not be farther from the truth. Should the Court scroll down on the first page of Exhibit "A" submitted by Kennard, the Court will see the following: An email dated December 22, 2023, to his entire staff, saying that he needs all these designations completed by tomorrow. Kennard's Exhibit A, page 1.

More importantly, Kennard attached exhibits in an attempt to further lie to this Court and infer Sprovach's personal email address on pleadings in this case after March 15 and prior to June 20. Again, that is not true. The funny thing is Kennard said that he could not respond to the previous

motions because he didn't have information in the client portal but he could get it together to respond here.

Based on Alfonso's June 29, 2023, pleading [Doc 52] in this case and the pattern he is currently engaging in regarding any case he assigned to Ellen Sprovach, he ignored this Court's Show Cause Order intentionally. Alfonso is ignoring every case he ever assigned to Ellen and letting the chips fall where they may, such as in this case. Unfortunately, in addition to failing in just about every way one can think of, it's ultimately his clients who suffer. His clients who paid HIM.

**<u>A very serious question exists as to whether Kennard even contacted Kim Thomas about Defendant's Motion for Sanctions and this Court's Show Cause Order.</u>**

Based on Alfonso's June 29, 2023, pleading he failed to inform his client, Kim Thomas, of the motion for sanctions and his failure to respond to this Court's Show Cause Order.

Ellen Sprovach would have contacted Ms. Thomas but cannot contact Ms. Thomas as she was no longer affiliated with her case beginning March 15, 2023. Ms. Thomas remains Alfonso's client as her agreement is with his firm, of which he is the sole owner.

This is important because if Kennard were genuine, he would contact Ms. Thomas, his client, and question her about this Court's query into the background into the falsification allegation and her response to same. Alfonso wholly failed to do so for his June 29, 2023, response to this Court.

The Undersigned would guess that Ms. Thomas does not know about any of this.

**<u>Falsification issues in employment cases</u>**

The issue of falsification in employment cases happens more often than people may think. It seems natural to reflectively want to defend yourself when accused of doing something untoward

that you did not do. One imagines taking umbrage - I want to defend myself, no matter the cost. The same with someone wrongfully accused of murder of a loved one. Not only did I not do it, I could not do it, but I'm going to move heaven and earth to find out who did.

It's important to note that Kim Thomas hired Alfonso Kennard and his firm prior to Sprovach coming to his law firm. Kennard took Ms. Thomas' case. The undersigned may have, too. At first, Kennard hired Cristabel Jimenez, then a first-year lawyer to Ms. Thomas' case. Kennard assigned Sprovach to this matter after the EEO charge was filed, a right to sue was issues and a Complaint was filed. Sprovach made an initial appearance in this matter a few weeks after joining Kennard's law firm. This was about the same time that Sprovach appeared in this Court on behalf of Kennard regarding filing pleadings against Federal entities in Federal court that contained state law.

**Confronting Ms. Thomas about the hospital visit alleged falsification document.**

Sprovach talked with and met Ms. Thomas. Sprovach talked to Ms. Thomas and liked her. She's a dog person and that helped.

It's also important to note that the undersigned is naturally suspicious and distrustful. The undersigned is from New Jersey. Ms. Thomas was consistent with her response to the hospital visit from the time she was still employed with Defendant. She was consistent with her response about the hospital visit with the Union. She was consistent with her hospital visit in her EEO charge sworn to under the penalty of perjury. She was consistent with her hospital visit in her lawsuit. She was consistent about the hospital visit in her sworn to under the penalty of perjury in her deposition. She was consistent about the hospital visit in her sworn to under the penalty of perjury declaration. Ms. Thomas has always maintained the same information about that hospital visit.

You can imagine when a motion to comes in and the Defendant has an exhibit that contends

that your client did falsify the hospital visit document you react initially with a groan, and an, oh man. Some options exist for responses here, one of which is not just ignoring the information.

Questioned a variety of ways, Ms. Thomas has never wavered. She was asked explicitly; can you imagine what someone would think who looks at this? She was asked to explain how it could possibly be. Her response has always been that she did not know how to explain it but she knows what she knows and she knows she was at the hospital that day.

Ms. Thomas even walked away from any compensation at mediation because she said she did not falsify anything and would rather take her changes to trial, even knowing that getting to trial in this civil matter was never a guarantee.

In addition to the background questioning of Ms. Thomas regarding the falsification allegations, Sprovach and at least one associate attorney at the firm, worked with Ms. Thomas on her sworn Declaration regarding that issue. Ms. Thomas reviewed and made changes to the Declaration, specifically with the regarding questions about the hospital visit and made very detailed changes to the language in the paragraph regarding that visit with distinctions to discharge and release hospital paperwork. Exhibit 6, Email to associate attorney containing Ms. Thomas' Declaration changes. Ms. Thomas continued to deny the falsification allegations.[5]

Sprovach and the associate attorneys working with this matter, taking all facts into account, reasonably relied on Kim Thomas' sworn denials of engaging in any falsification activity. *Thomas v. Capital Sec. Servs., Inc*., 836 F.2d 866, 875 (5th Cir. 1988).

This all may still sound crazy to some. It is an issue for a fact finder to determine if it is credible; is it criminal. The undersigned contends it is not.

**The Hospital (HCA) did make material mistakes in its Declaration about this case.**

First, the Hospital did make mistakes in Kim Thomas' case with information so basic about her that the very person who submitted a sworn under penalty of perjury in this case, swore that all the information about Plaintiff was true yet had her name completely wrong as Kim Taylor instead of Kim Thomas. It was only after the undersigned contacted Defendant's counsel in this case and informed him of the hospital's material mistake in its sworn declaration that she again swore to the truth only after I corrected it. If it happened once, it could happen again. Exhibit 7 Original Declaration of Carolyn Imbrugia. After the undersigned pointed out this significant hospital mistake, Ms. Imbrugia changed her declaration.

**Kim Thomas was already covered by intermittent FMLA.**

Second, the hospital visit had no bearing or basis on Kim's day off. Kim was on approved FMLA (intermittent) at the time of her firing. All Kim had to do was tell her supervisor that the two hours on that Saturday were covered under her intermittent FMLA, which she did. Going even further than she was required to do, Kim followed up and saw her own physician who provided her with a note to take to her employer, Defendant. Ms. Thomas provided the physician's note to her employer which explicitly covered the Saturday, time period at issue before the Court. The hospital visit is a red herring.

**Times when the undersigned has actually dropped a client for lying or falsifying.**

The undersigned has had cases with similar issues. While alleged falsification might seem like it's a touchy issue for discussion with the client, it was not for Ms. Thomas. The undersigned is incredibly direct (New Jersey) and has no problems with confrontation. A particular previous client comes to mind. The former employee was a high-level international employee originally from Brazil. The major theme of his discrimination case was an email from his Director to him. The undersigned used that email in a very mean letter and in the EEO charge. This particular oil

and gas company has an excellent Ombudsman program and the matter was mediated. The very well-known mediator, who would most likely remember this situation and be able to recall the events to this Court, pulled the undersigned out of the room with opposing counsel and presented the email. Then she presented the real email. The original. It looked like the client doctored THE email. The undersigned compared the emails and asked if there was any meta data regarding same. There was. And an IT person was standing by who could explain it. So then, coupled with two different back up items, the client was confronted. He did not admit the falsification right away. The undersigned had to confront him, confront independently with and without his wife and with the mediator. Only after being told the undersigned would no longer represent him after that day, did he admit it. This is not a matter or issue Ellen Sprovach takes lightly. The mediator said that she knew Ellen would not tolerate this. (Also the reason her son is more afraid of mom than school).

Ms. Thomas has never wavered or backed down from her position, even after being confronted. Ms. Thomas was well aware when confronted that she swore to this as the truth under the penalty of perjury. Putting her demeanor, her knowledge that this process is a long haul and not plaintiff friendly anyway, her consistency, comparing this to the undersigned's other interactions with her, the fact that she was willing to and did leave mediation, the undersigned more believed Ms. Thomas than not.

This is one part of the fork in the road. The other side is the "what happens why I don't believe my client or think they are lying?' part of the fork. It does happen.

**<u>Context: Responsibility and Representation</u>**

In the case described above, it was easy. [6] The attorney-client relationship is over. The

---

[6] The undersigned can provide the Court with the name of the mediator and any other information the Court would deem helpful.

undersigned worked her way through undergraduate and law school; she's not risking her name and license for a client. It's not so easy when the client wholly and completely denies the allegation.

Coupled with the denial, which includes context, the fact that the hospital, even after it knows there are allegations that it made a mistake with regard to Ms. Thomas, made more mistakes about her in its sword declaration about her to this Court. One would presume that declaration would have been reviewed over and over before swearing to its accuracy *also under the penalty of perjury.*

The undersigned contends that this at least shows a fact issue regarding whether the hospital could have made a mistake. Because that is the flip side to falsification. Certainly, it helps show that Ms. Thomas was not trying to engage in a criminal behavior.

That situation does bring up issues regarding responsibility and representation. Certainly if a lawyer believes a client is client or trying to perpetuate a fraud, they have an out. On the contrary side, to say to a client I know you swear under oath repeatedly to this fact, that you are willing to risk the penalty of perjury, you have not changed your story, didn't need the hospital information anyway, your own doctor issues a note covering your time off and the hospital continued to make mistakes about you in a sworn declaration after all this happened but I am not responding the Defendant's Motion, no longer representing you and you cannot have the money back you paid Mr. Kennard. The undersigned did not feel that the scenario, in  a context that she experienced, rose to that scenario.

**The awkward position of telling a Court that you disagree.**

This is a difficult position to take with a Court; to essentially say your order is wrong. Having the advantage of getting to know Ms. Thomas after she hired Kennard, the undersigned

was able to experience more context and gather a positive opinion. It may have not been presented well to the Court, it may just be the undersigned's opinion, it may just be wrong.

While the undersigned did expect Alfonso to respond the ridiculous way he did, she did not expect him to throw his own client, Kim Thomas, under the bus as well. Kennard has and had a duty to inquire as to Kim Thomas and the hospital visit document.

Kennard did not. He certainly did not contact the undersigned.

The undersigned is also sorry and apologizes to this Court to drag it into Kennard Law's dirty business. Three side issues exist.

One, the undersigned noted that virtually this exact same scenario exists in at least one other case before your Honor. Two, Kennard would not answer the calls and emails of the Court reporter in Ms. Thomas' case and they are no threatening to sue the undersigned in this case. The undersigned requests that this Court Order Kennard to that invoice. Third, the undersigned is aware that Kennard will continue to file pleadings in this matter (and others unfortunately) lying about the facts in this case to this Court. The undersigned requests an Order restricting Kennard's pleading.

The undersigned moves this Court to deny any sanctions against any person or entity in this case. The undersigned respectfully contends that a fact issue exists for the jury to consider that issue. Neither Ms. Thomas nor Ellen Sprovach ignored Defendant's Motion for Sanctions or this Court's Show Cause Order.

Alfonso Kennard, Jr. ignored this Defendant's Motion for Sanctions and wholly and intentionally ignored this Court's Show Cause Order. When called out, Kennard lied[7] to this Court.

---

[7] In addition to all his lies, Kennard falsely notated Sprovach as Attorney for Plaintiff at the very end of his June 29, 2023, pleading [ Doc. 52]. He must think that particular lie to this Court is funny.

**PRAYER**

Ellen Sprovach respectfully requests this Court reconsider and withdraw its sanction order and criminal referral order as it relates to the undersigned. The undersigned is aware this Court did not have all the information regarding the sanction issue and has provided what she has access to. Ellen Sprovach also requests this Court order for Kennard Law to pay the deposition fee Kennard Law incurred[8] in this case.

The undersigned, is of course, makes herself available to this Court for any hearings or any follow up in this matter.

Respectfully submitted.

*Ellen Sprovach*
Ellen Sprovach
Federal Bar No. 22202
Texas Bar No. 24000672
ellensprovach@gmail.com
713.443.9001.

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of this document by all counsel through the ECF electronic filing system on June 30, 2023.

*Ellen Sprovach*
Ellen Sprovach

[8] Kennard actually attached a copy of the deposition in his June 29, 2023, pleading. He refuses to pay Carol Davis Reporting. Carol Davis Reporting has stated that Kennard wont answer or respond to their queries. They have forwarded the invoice to their attorneys for suit.

**DECLARATION OF MICHELLE SANCHEZ**

1. I, Michelle Sanchez, worked at Kennard Law, P.C. from August 2019 to January 2023. My ending job title at Kennard Law, P.C. was Director of Client Relations.

2. I was working for Kennard Law, P.C. on Friday, December 23, 2022.

3. I was directed to work on a task that took the entire work day and into the evening hours of Friday, December 23, 2022. I and several other coworkers were instructed to file a pleading in every client court case Alfonso Kennard Jr. was named on as Attorney. The pleading that was filed on this day indicated that either Ellen Sprovach or one of the other Attorneys working at Kennard Law, P.C. was now the sole firm Attorney representing the client on the case matter. These were client cases in State and Federal court including other jurisdictions.

4. The purpose of the task assigned to us, to my knowledge, was to remove Alfonso Kennard, Jr. as a practicing legal representative in all cases.

5. Ellen Sprovach did not participate in the above action. To my knowledge on Friday, December 23, 2022, Ellen Sprovach, was on the road driving out of Texas for the Christmas Holidays.

I, Michelle Sanchez, declare under penalty of perjury, that the foregoing is true and correct.

DocuSigned by:
Michelle Sanchez
40FE265FF7FD463...
______________________________
Michelle Sanchez

6/28/2023
_________________________
Date

## DECLARATION OF MEGGAN GRAYSON

1. I worked at Kennard Law as a Legal Scheduler, Legal Assistant and Case Manager. On December 23, 2023, I was a Case Manager with the firm.

2. I was directed to work on an urgent task - filing pleadings in every case of Alfonso Kennard, Jr.'s that day until the late evening hours. My job as well as that of others was to draft pleadings with the language that Alfonso Kennard Jr. was no longer working on cases and that Ellen Sprovach or the other attorney in the office was the sole legal counsel for that case.

3. Mr. Kennard never paid my last paychecks and I and others particularly never got paid for this work and staying late, right before Christmas.

4. We did not work with Ellen Sprovach on this activity; she was out of the office out of town for Christmas.

These facts are true and correct and according to my first-hand knowledge. I, Meggan Grayson, declare so under penalty of perjury, that the foregoing is true and correct.

Meggan Grayson

06-28-2023
Date

2:44

Photo Done

Me
1:11 PM, Jan 3

(No subject)

Honestly, and with permission to speak freely, I'm not ok; I was hoping this would be a new year of new beginnings for the firm. When I woke up I noticed we are negative in the account. I needed to make several payments with the money we received last week. We owe IT 3 months, health insurance is about to expire, the building, Kris and Leah's payroll, back taxes for W-2s, and payroll is scheduled for next week again, and Scorpion. I don't care what you do on your personal time but why would you spend money and go out of town knowing we are in a financial crisis? The same thing happened during Thanksgiving and you had to pay the Amex off. Obviously, that money wouldn't even cover a portion but it would help resolve some items on the list. I'm sure I'll be let go because of this message but I don't want to start of 2023 holding back. I've come to realize it doesn't matter how much money the firm makes somehow its never enough due to lack of financial restraint. You have so many employees who have been loyal to you through everything and yet you still don't see how excessive spending is hurting the firm. I can't be here if changes aren't made, I don't want to be financial stressed out at work and at home. It doesn't make sense to me. In order for the firm to operate I need you to take some accountability. I really care about the company and everyone involved, and I hope you do too, but each time your actions show me otherwise. I'm all for having fun but I'm overwhelmed with collection calls text messages and emails from every outlet asking for payments. I'm doing my best to bring money in a automate but I can't do it without funding and your legal teams time to work on the documents. I care about you and your company. I'd rather be honest and let go then pretend all is well.

Declaration of Cristabel Jimenez, esq.

I am over the age of eighteen and make the following statement of sound mind.

I joined Kennard Law P.C. in December of 2020. I was assigned cases and spoke to potential new clients with little to no direction from the firm's name partner Alfonso Kennard. Mr. Kennard was not available to answer questions or provide direction in any cases under his name. Additionally, I was tasked to respond to Motions for Sanctions against him in Minnesota and other cases. Mr. Kennard rarely responded to emails and when he did the responses were unhelpful and oftentimes in the middle of the night.

In June of 2021, Ms. Ellen Sprovach joined the firm as a shareholder. She communicated that she was only a shareholder in title not equity. Ms. Sprovach single handedly rectified over ninety cases that had incorrect petitions and filings. It was not until Ms. Sprovach joined the firm that I realized how cases should be handled. Her experience was undeniable as she followed the Rules of Civil Procedure and did things according to State and Federal Law. Ms. Sprovach also personally represented Mr. Kennard on many occasions in cases where he was going to be sanctioned and/or held in contempt for not responding to pleadings.

I left the firm in April of 2022 when I realized that the compensation detailed in my offer letter was unilaterally being altered by Mr. Kennard to fit whatever was convenient for him. Including not paying me the 20% of retainers for over sixty (60) clients I signed up. While the offer letter I accepted stated it was part of my compensation, Mr. Kennard stated it was a discretionary bonus and refused to pay me nearly $20,000 and warned that if I left the firm, I would never get that compensation. Additionally, while Mr. Kennard missed payroll payments to all his employees, he also blamed the employees for his shortcomings as the head of the firm.

If it were not for Ms. Sprovach joining the firm in 2021, I would have left the law firm that was being run to the ground by Mr. Kennard.

I declare the foregoing statements are true under the penalty of perjury.

Cristabel Jimenez, esq.

6-30-23

Date

**From:** Ellen sprovach
**To:** ellen@wersinglaw.com
**Subject:** Fwd: Notification of Service for Case: A210740, MICHAEL JOHNSON vs VALERO SERVICES INC for filing Motion (No Fee), Envelope Number: 76021454
**Date:** Friday, June 30, 2023 2:55:48 PM

---

---------- Forwarded message ---------
From: **Ellen sprovach** <ellensprovach@gmail.com>
Date: Thu, May 25, 2023 at 5:22 PM
Subject: Fwd: Notification of Service for Case: A210740, MICHAEL JOHNSON vs VALERO SERVICES INC for filing Motion (No Fee), Envelope Number: 76021454
To: Christyle Giron <christyle.giron@kennardlaw.com>

Christyle, Mr Johnson hired Kennard Law to represent him. The firm has not filed a notice taking me off the case. I have asked you over nine (9) times to do so.

Begin forwarded message:

> **From:** no-reply@efilingmail.tylertech.cloud
> **Date:** May 25, 2023 at 4:17:15 PM CDT
> **To:** ellensprovach@gmail.com
> **Subject: Notification of Service for Case: A210740, MICHAEL JOHNSON vs VALERO SERVICES INC for filing Motion (No Fee), Envelope Number: 76021454**

---------- Forwarded message ---------
From: <pacer@psc.uscourts.gov>
Date: Mon, Jun 5, 2023 at 3:07 PM
Subject: PACER Registration Status
To: <sprovache@gmail.com>

Account #: 7539232

Ellen Sprovach
1243 W. 21st
Houston, TX 77008
713-443-9001

An account for your firm already exists. Please use the forgotten password/forgotten username utility on www.pacer.gov to access PACER.

If you have any questions, contact the PACER Service Center by email at pacer@psc.uscourts.gov or by phone at (800) 676-6856. The PACER Service Center hours of operation are Monday through Friday 8:00 AM to 6:00 PM CT.

Thank you for your interest in PACER!

E

ReplyForward



image0 (1).jpeg

Kim Thomas-Phone Note (832) 594-3951 12:27 PM Call Duration 6 Minutes – Message

Message Help

Share to Teams Mark Unread Find Zoom

im Thomas-Phone Note (832) 594-3951 12:27 PM Call Duration 6 Minutes

Reply Reply All Forward

Tue 9/6/2022 12:51 PM

Matthew Miller
To Leah Badri; Ellen Sprovach
Cc Samantha Cobb; Kristina Blanco

If there are problems with how this message is displayed, click here to view it in a web browser.

ah,

s. Thomas called to let me know that she had e-signed her Declaration. She did say that she had a question regarding the usage of the term ischarge Papers" in paragraph #15 (below). Ms. Thomas said the actual term used by Ms. Holmes in the phone recording was **"Release Papers"** stead of discharge papers. I let Ms. Thomas know that I would relay that information to you, but I believe that it would be reasonably understoo at both terms refer to the same thing.

*5. On or around August 13, 2019, I received a phone call from Ms. Holmes directing me to bring* ***discharge papers*** *from my July 20th hospital visit our upcoming meeting.*

**Matthew Miller**
Legal Assistant

Kennard Law, P.C.
5120 Woodway Drive | Suite 10010 | Houston, Texas 77056



Kim Thomas-Phone Note (832) 594-3951 12:27 PM Call Duration 6 Minutes – Message (HT...

Message Help

Share to Teams | Mark Unread | Find | Zoom

im Thomas-Phone Note (832) 594-3951 12:27 PM Call Duration 6 Minutes

Reply | Reply All | Forward

MM Matthew Miller
To Leah Badri; Ellen Sprovach
Cc Samantha Cobb; Kristina Blanco

Tue 9/6/2022 12:51 PM

If there are problems with how this message is displayed, click here to view it in a web browser.

ah,

s. Thomas called to let me know that she had e-signed her Declaration. She did say that she had a question regarding the usage of the term ischarge Papers" in paragraph #15 (below). Ms. Thomas said the actual term used by Ms. Holmes in the phone recording was **"Release Papers"** stead of discharge papers. I let Ms. Thomas know that I would relay that information to you, but I believe that it would be reasonably understood at both terms refer to the same thing.

*5. On or around August 13, 2019, I received a phone call from Ms. Holmes directing me to bring discharge papers from my July 20th hospital visit our upcoming meeting.*

**Matthew Miller**
Legal Assistant

Kennard Law, P.C.
5120 Woodway Drive | Suite 10010 | Houston, Texas 77056

Send/Receive | This folder was last updated on 12/20/2022. | Need Password | 97°F

# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **KIM L. THOMAS,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **NO. 4:21-CV-01301** |
| | § | |
| **UNITED AIRLINES, INC.,** | § | |
| | § | |
| ***Defendant.*** | § | |

---

## DECLARATION OF CAROLYN IMBURGIA

---

I, Carolyn Imburgia, based upon my personal knowledge, do hereby declare, verify, and state as follows:

1. I am employed by HCA Houston Healthcare Northwest in the position of Director, Health Information Management. In this position, I have knowledge of the electronic medical records system used by Houston Healthcare Northwest.

2. I had the opportunity to review a document, Discharge Instructions for Kim L. Taylor, provided to me by United Airlines, Inc. A true and correct copy of the document that I reviewed is attached as Exhibit 1 to this declaration.

3. The medical record number, BN30226335, and account number, BN0243033660, reflected on the Discharge Instructions are associated with the dates of service August 13, 2019 through August 14, 2019.

4. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Carolyn Imburgia ______________________ 7-26-22 ______________________

Carolyn Imburgia Date Executed

ANGELICA VASQUEZ
Notary Public, State of Texas
Comm. Expires 01-24-2023
Notary ID 131867005

**PRE ER**

DOB: 05/27/[redacted] F

DISCHARGE INSTRUCTIONS

07/20/19
THOMAS, KIM L
BN0243033660/BM30226335

---

HCA Houston Northwest

It has been a pleasure caring for you. If you have questions or concerns, or your symptoms worsen after discharge, please contact your physician.

---

**DISCHARGE INFORMATION**

DISCHARGE TO:
Home

Return to work/school: No
Return to work/school restrictions: No

---

**YOUR DIET**

[redacted]

Mls allowed per day:

Weight monitoring: Daily

---

**YOUR ACTIVITY**

as tolerated

---

**FOLLOWUP LABS, PROCEDURES, TREATMENTS**

Follow up with PCP

---

**PHYSICIAN FOLLOWUP APPOINTMENTS**

Attending Physician: Ilo, Sheriffdeen O DO
Attending Physician Phone: 713-428-6296

---

Most recent [redacted] result: [redacted]

---

**For Patients Who Smoke**

You should quit. It is the most important thing you can do for your health.

Here are other FREE resources you can use.

The American Cancer Society: 1-800-227-2345
The American Lung Association: 1-800-548-8252
Internet site: http://smokefree.gov

4132358
PER ESC

20